**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 15, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

DREENA M. BARKER,

       Plaintiff-Appellant,

v.

MICHAEL D. ASTRUE, in his capacity
as Commissioner of the Social Security
Administration,

       Defendant-Appellee.

No. 10-4195
(D.C. No. 1:09-CV-72-SA)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **MURPHY**, **HOLLOWAY,** and **HARTZ**, Circuit Judges.

Plaintiff-Appellant Dreena M. Barker appeals the district court's order affirming

the Commissioner of Social Security's decision to deny her request for disability

insurance benefits under the Social Security Act ("Act").  The district court exercised

jurisdiction over this case, which presents questions of federal law, pursuant to 42 U.S.C.

§ 405(g), and upheld the Commissioner's decision.  We have jurisdiction to hear this

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

appeal from the district court's final decision pursuant to 42 U.S.C. § 405(g) and 28 U.S.C. § 1291.

Ms. Barker's claim for disability insurance benefits turns on whether her infliction of multiple sclerosis disabled her such that she could not work on the date she was last insured, *i.e.* by March 31, 2003. On appeal, Ms. Barker argues that the Commissioner of the Social Security Administration ("Commissioner"), through an administrative law judge, failed to properly evaluate and weigh the entire body of medical evidence, Ms. Barker's own testimony, and statements by third-party lay witnesses. Specifically, Ms. Barker asserts that the degree of impairment of manual dexterity and coordination in her dominant right hand was incorrectly determined by the Commissioner. As a result of this alleged error, Ms. Barker contends that the Commissioner incorrectly assessed her residual functional capacity, leading to an erroneous conclusion that, as of March 2003, she could perform her past relevant work as an art director as that work is performed in the national economy. "We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence and whether the correct legal standards were applied." *Angel v. Barnhart*, 329 F.3d 1208, 1209 (10th Cir. 2003). We **AFFIRM** the district court's decision upholding the Commissioner's final decision.

## I. Background

### A. Factual and Medical Background

Ms. Barker was diagnosed with multiple sclerosis ("MS")[1] in the early 1990s.

Despite this diagnosis, at first the disease did not impose substantial physical limitations.

In 1991, around the same time she was diagnosed, Ms. Barker started her own business,

where she worked as a graphic artist and art director. She had worked in the same

capacity for other companies during the previous sixteen years. Upon being diagnosed

with MS, Ms. Barker periodically saw a neurologist, Dr. Michael Williams, through

November of 2003. Ms. Barker's visits to Dr. Williams did not occur on any set

timeframe — for example, after a visit at some point in 1998 she did not see Dr. Williams

again until August 2001. Tr. at 165.[2]

Sometime in 2000 or 2001, Ms. Barker's infliction of MS began to take a

discouraging turn for the worse and became more progressive in nature. Consequently,

Ms. Barker's physical condition began a course of deterioration. Exactly how quickly the

MS took hold and how ravaging its effects on Ms. Barker's livelihood were is unknown.

---

[1] Multiple sclerosis is "a disease in which there are foci of demyelination [*i.e.* 'destruction, removal, or loss of the myelin sheath of a nerve or nerves'] throughout the white matter of the central nervous system, sometimes extending into the gray matter[.] [S]ymptoms usually include weakness, incoordination, paresthesias, speech disturbances, and visual complaints. The course of the disease is usually prolonged, so that the term *multiple* also refers to remissions and relapses that occur over a period of many years." Dorland's Illustrated Medical Dictionary 486, 1680 (32d ed. 2012).

[2] Citations of "Tr." reference the transcript of the proceedings before the Commissioner, which is incorporated into the appellant's appendix.

Sadly, this litigation turns on the precise slope of the decay caused by Ms. Barker's disease.[3]

Among many other deleterious effects, MS has undisputedly affected Ms. Barker's motor skills, coordination, and manual dexterity in her dominant right hand. The precise onset date and manifestation of those effects, however, is the primary subject of dispute in this appeal. In a visit to Dr. Williams in August 2001, Ms. Barker was observed to have a "mild degree of finger-nose-to-finger [sic] ataxia" in both of her upper extremities.[4] Tr. at 165. Unfortunately, Dr. Williams's treatment notes from the 2001 visit do not reveal any precise measure of the degree to which this ataxia impaired Ms. Barker's functioning, particularly as applied to her job. Ms. Barker's next visit with Dr. Williams came in August 2002, though on that occasion the doctor made no specific observations about Ms. Barker's coordination, motor skills, or manual dexterity. Dr. Williams did note that Ms. Barker reported no exacerbations due to her MS over the

---

[3] Ms. Barker's insured status (for Social Security purposes) expired on March 31, 2003. Thus, in order to be eligible for DIB, Ms. Barker's disability must have had an onset date of March 31, 2003 or sooner. *See, e.g., Potter v. Secretary of health & Human Services*, 905 F.2d 1346, 1348-49 (10th Cir. 1990) ("The relevant analysis is whether the claimant was actually disabled prior to the expiration of her insured status.") (emphasis omitted). The only issue raised in this appeal is whether the ALJ properly concluded that Ms. Barker's disability had not begun by this date. Thus, medical records and other evidence reflecting upon Ms. Barker's condition immediately before and after March 2003 are of particular concern in this case.

[4] Ataxia is "failure of muscular coordination; [or] irregularity of muscular action." Dorland's Illustrated Medical Dictionary 153 (32d ed. 2012).

course of the previous year, although she did discuss some overall degradation in her "energy, strength, and balance." Tr. at 163.

After the August 2002 session with Dr. Williams, Ms. Barker did not visit Dr. Williams (or any doctor) until November 2003. On that occasion, Dr. Williams noted slow deterioration of Ms. Barker's condition — in particular, he reported an "increasingly weak" and "poorly controlled" right side along with impaired balance. Tr. at 159. In January 2004, pursuant to a discussion with Dr. Williams, Ms. Barker began attending an MS clinic at the University of Utah. Tr. at 159, 228. There, Ms. Barker's treating nurse, Julia Klein, made thorough notes regarding Ms. Barker's condition.[5] Specifically, Ms. Barker reported to Ms. Klein an exacerbation of her condition in November 2003 relating to spasticity in her legs. Tr. at 228. Among other things, Ms. Klein also recorded that Ms. Barker reported "increased incoordination, especially with the right hand, with decreased dexterity over time." *Id.* Ms. Klein performed objective testing which showed "normal bulk and tone with mild intention tremor on the right with finger-to-nose testing" that was "course in nature." Tr. at 230. Ms. Klein also reported "mild dysmetria

---

[5] At the time of her work with Ms. Barker, Ms. Klein was an "APRN," *i.e.* advanced practice registered nurse. Tr. at 240; Dorland's Illustrated Medical Dictionary 121 (32d ed. 2012).

bilaterally"[6] with "slow rapid alternating movements on the right." *Id.*

In June 2004, Ms. Barker visited a new doctor, Dr. Ryan Nelson, for a consultative examination. With regard to dexterity issues, Ms. Barker complained to Dr. Nelson of "difficulty using her right hand." Tr. at 182. Dr. Nelson recorded full strength in Ms. Barker's right side for wrist flexion, wrist extension, and grip. Tr. at 184. Ms. Barker's finger abduction in her right hand was scored as 4 out of 5. *Id.* Dr. Nelson described Ms. Barker as having "relatively normal strength and range of motion" and the ability to "manipulate small objects without any difficulty." Tr. at 185. He reported "no compromise" in Ms. Barker's manual dexterity. *Id.*

Ms. Barker visited a psychologist in July 2004, to whom she reported problems with her right hand. Specifically, Ms. Barker complained of an inability to "type, write, or draw for more than a brief period." Tr. at 169. The psychologist did not perform a physical examination of Ms. Barker. In December 2004, Ms. Barker was again evaluated by Dr. Nelson. As a result of that assessment, Dr. Nelson noted "compromise" of Ms. Barker's manual dexterities that would prevent her from performing most duties associated with a routine desk job. Tr. at 181. Similarly, Dr. Nelson observed that Ms. Barker could not handle light objects effectively or manipulate them. *Id.* As a result of Ms. Barker's deteriorated condition between the June 2004 and December 2004

---

[6] Dysmetria is "a condition in which there is improper measuring of distance in muscular acts; [or] disturbance of the power to control the range of movement in muscular action." Dorland's Illustrated Medical Dictionary 510 (32d ed. 2012).

6

assessments, the Commissioner determined that Ms. Barker was disabled as of September 1, 2004 and awarded her supplemental security income benefits as of that date. Tr. at 304-05. However, because Ms. Barker's onset date (September 1, 2004) was *after* her date last insured (March 31, 2003), she was denied disability insurance benefits ("DIB").

### B. Procedural Background

Ms. Barker applied for DIB under the Social Security Act in March 2004, alleging disability as of her undisputed last date of insurance eligibility under the Act, March 31, 2003. Tr. at 17. Ms. Barker claimed that she was disabled because her infliction of MS had progressed by March 2003 so as to preclude her from working in her job as an art director and graphics designer. Ms. Barker's initial claim for DIB and subsequent request for reconsideration were denied by the Commissioner in January 2005 and May 2005, respectively. Tr. at 17. An administrative law judge ("ALJ") upheld the Agency's denial of benefits in December 2006. Tr. at 30. The Agency's Appeals Council affirmed the ALJ's decision in August 2007. Tr. at 5. Ms. Barker challenged the Appeals Council's decision in federal court, and in July 2008 the district court remanded the case back to the Appeals Council for further administrative proceedings. Aplt. App'x at 19. The Appeals Council, in turn, remanded the case back to the ALJ. Tr. at 354.

As instructed by district court's remand order, the ALJ sought further records from Ms. Barker's treating physician. Tr. at 361. The treating physician did not provide any further records or information. Tr. at 360. As a result, the ALJ retained an independent medical expert to offer further testimony at a second hearing in Ms. Barker's case in

7

November 2008. Tr. at 367-429. Following that hearing, the ALJ again upheld the

Commissioner's denial of DIB in a decision dated December 8, 2008. Tr. at 311. The

Appeals Council declined further review of the ALJ's decision; thus, the ALJ's

December 2008 denial of DIB became the final decision of the Commissioner. Tr. at

291A. Subsequent to that renewed denial, Ms. Barker filed a second complaint in federal

court challenging the Commissioner's final decision, thus instituting the action

underlying this appeal. In September 2010, the district court upheld the Commissioner's

denial of benefits. Aplt. App'x at 5. In this appeal, Ms. Barker challenges the district

court's affirmance of the Commissioner's final decision.

## II. Discussion

The regulations expounding on the Social Security Act establish an intricate

system for making disability determinations. Central to that system is a five-step process

which the Commissioner must follow in asking whether a claimant like Ms. Barker is

"disabled" for purposes of the Act.[7] The ALJ ruled at step four of the process,

---

[7] We have previously described the five-step process:

Step one requires a claimant to establish she is not engaged in "substantial gainful activity." *See* 20 C.F.R. §§ 404.1520(b), 404.1572. Step two requires the claimant to establish she has a "medically severe impairment or combination of impairments." *See id.* §§ 404.1520(c), 404.1520a-404.1523. Step three asks whether any "medically severe impairment," alone or in combination with other impairments, is equivalent to any of a number of listed impairments so severe as to preclude "substantial gainful employment." *See id.* §§ 404.1525-404.1526 & pt.

8

concluding that Ms. Barker was not disabled under the Act. Underlying that conclusion was a finding that Ms. Barker's residual functional capacity (RFC) allowed her to:

> "Perform sedentary work as defined in 20 CFR § 404.1567(a) and 417.967(a), except she cannot lift more than 10 pounds or stand or walk more than 2 hours per 8-hour day [.] . . . [S]he has mild manual dexterity limitations with [her right] hand and cannot perform rapid repetitive movements more than [one-half] of the workday [.] . . . [B]ecause of fatigue, she must be able to lie down for up to 1 hour during the workday, which may be done during the standard 15-minute morning and afternoon breaks and for part of the lunch break."

Tr. at 305. The ALJ then determined, based on the testimony of a vocational expert, that this RFC *would not* allow Ms. Barker to perform her past relevant work as she had performed it, but *would* allow her to perform that work as it is generally performed in the national economy. Tr. at 310. Ms. Barker raises two arguments on appeal. First, she contends that the ALJ's RFC determination was erroneous. Second, Ms. Barker asserts that the ALJ incorrectly concluded that her RFC allowed her to perform her past relevant work.

---

404, subpt. P, App. 1. If listed, the impairment is conclusively presumed disabling. *See id.* § 404.1520(d).

If [the claimant's impairment is] unlisted [at step three], the claimant must establish at step four that her impairment prevents her from performing work she has previously performed. *See id.* § 404.1520(e), (f). If the claimant is not considered disabled at step three, but has satisfied her burden of establishing a prima facie case of disability under steps one, two, and four, the burden shifts to the Commissioner to show the claimant has the residual functional capacity (RFC) to perform other work in the national economy in view of her age, education, and work experience. *See id.* § 404.1520(g).

*Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005) (paragraph break added).

9

We begin our review of Ms. Barker's case by evaluating the propriety of the ALJ's RFC determination, and then consider whether Ms. Barker's RFC justifies the ALJ's conclusion that she could perform her past relevant work as defined in the social security regulations.[8]

## A. Standard of Review

We review the ALJ's factual findings to determine whether they are supported by substantial evidence in the record. *Lax v. Astrue*, 489 F.3d 1080, 1084. Substantial evidence is defined as relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.* It is more than a mere scintilla, but less than a preponderance of the evidence. *Id.* The possibility that two conflicting conclusions might be reached does not preclude the substantial evidence standard from being satisfied. *Id.* "We consider whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases, but we will not reweigh the evidence or substitute our judgment for the Commissioner's." *Id.* (quotations omitted). However, "we meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings[,] in order to determine if the substantiality test has been met." *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir.

---

[8] Ms. Barker also asks us, if we rule in her favor, to determine that the Commissioner cannot satisfy his burden at step five of the sequential evaluation process. Because we uphold the Commissioner's decision, reached at step four of the sequential evaluation, we do not consider this argument.

10

2007) (quotations omitted).

## B. RFC Determination

Ms. Barker attacks the ALJ's RFC finding on three grounds. First, she claims that the medical record evidence was improperly weighed. Second, Ms. Barker says that the ALJ did not properly assess the credibility of her own testimony and thus gave it insufficient weight. Lastly, she asserts that testimony of third-party lay witnesses was also incorrectly evaluated and weighed. Each of these arguments attacks the ALJ's finding that Ms. Barker had only "mild" manual dexterity limitations and that she could perform "rapid repetitive movements" for one-half of a work day. We conclude that the ALJ did not commit legal error in his evaluation and weighing of the evidence, and thus uphold his determination of Ms. Barker's RFC.

### 1. Medical Record Evidence

Ms. Barker claims that too much weight was placed on the June 2004 assessment in light of the other available medical evidence. Specifically, Ms. Barker protests that earlier assessments, most notably the August 2001 assessment by Dr. Williams, are at odds with the results of Dr. Nelson's June 2004 assessment. We disagree. Even if there is a degree of inconsistency between the 2001 assessment where "mild" finger-to-nose ataxia was noted (Tr. at 165) and the June 2004 assessment where there was "no compromise of manual dexterity" (Tr. at 307), the 2001 assessment does not undercut the notion that Plaintiff's limitations in her right hand were "mild" as described in the RFC (Tr. at 305). Indeed, the ALJ reconciled the differences between the June 2004

11

assessment (which noted no compromise of manual dexterity) and earlier medical reports (which noted some compromise of manual dexterity) in favor of Ms. Barker by concluding that Ms. Barker's RFC included "mild manual dexterity limitations" with her right hand. Tr. at 305.

Unfortunately, as is prone to be the case with multiple sclerosis, a disease whose effects are amorphous and ever-changing, the medical records do not reflect a clear course of progression of Ms. Barker's disease. They are especially lacking in and around the crucial time in this case — March 2003. There are no medical records in the transcript between August 2002 and November 2003; the transcript reflects that Ms. Barker did not ever visit a doctor during that time period. The expert who examined all of Ms. Barker's medical records and testified on remand, Dr. Kendrick Morrison, focused in on the evidence of Ms. Barker's manual dexterity. He indicated that the first reference to dexterity troubles was in August 2001 by Dr. Williams (mild ataxia), and the next reference to manual dexterity was not until December 2004, when Dr. Nelson found that her manual dexterity had been compromised. Tr. at 388-89. In summing up the medical records, Dr. Morrison said that there was "at least some weakness in the right extremity, ataxia" and that "the RFC would be sedentary at best at that time [*i.e.* March 2003]." The ALJ's ultimate conclusion as to Ms. Barker's RFC in March 2003 is wholly consistent with Dr. Morrison's testimony. Thus, the medical records, despite their sparseness, constituted substantial evidence to support the ALJ's conclusion as to Ms. Barker's RFC, particularly the severity of coordination problems in her right hand.

12

Ms. Barker would have us go further, and infer that her condition had significantly worsened between August 2001 and March 2003. This inference is supported, Ms. Barker says, by the December 2004 report which showed substantial deterioration in dexterity. Ms. Barker argues that, in light of the August 2001 assessment ("mild ataxia") and December 2004 assessment ("compromise of manual dexterity"), the June 2004 assessment ("no compromise of manual dexterity") is simply nonsensical. However, even though the finding in the June 2004 assessment of "no compromise" is seemingly at odds with the other assessments, an inference that Ms. Barker's coordination problems were still only "mild" as of March 2003 — as was made in the RFC — is supported by the medical record evidence on which Ms. Barker urges us to rely. To be sure, an inference that Ms. Barker's coordination had deteriorated more severely might also be supportable. But as we have said, "the possibility of drawing two inconsistent conclusions from the evidence does not preclude an administrative agency's findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quotations omitted). Thus, the ALJ's determination of Ms. Barker's RFC was supported by substantial medical record evidence.

### 2. *Claimant's Testimony*

Ms. Barker claims that insufficient weight was given to her own testimony. Specifically, Ms. Barker claims that the ALJ improperly discredited her claims that she lost the ability to draw, paint, manipulate a mouse, use a keyboard, or otherwise perform her duties as an artist. The ALJ's conclusion that Ms. Barker's RFC included the ability

to perform rapid repetitive movements for one-half the workday is at odds with Ms. Barker's assertion that she could not manipulate a mouse or keyboard *at all*. The ALJ acknowledged as much: "[T]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." Tr. at 306.

However, the ALJ noted that objective medical evidence did not, in itself, substantiate Ms. Barker's claim about the severity of her deterioration of manual dexterity as of March 2003, which is a fair characterization of the record's reflection of a lack of objective testing about Ms. Barker's manual dexterity between August 2001 ("mild ataxia") and December 2004 (manual dexterity was significantly affected). More specifically, the ALJ deemed Ms. Barker's failure to visit a doctor for these claimed dexterity problems to be probative of their mild intensity. Tr. at 308-09. Thus, the ALJ's credibility finding was reasonably grounded, among other things, on Ms. Barker's failure to report coordination problems to her doctors. *Id.*; *cf. Kepler v. Chater*, 68 F.2d 387, 391 (10th Cir. 1995) (stating that a claimant's failure to seek medical treatment may be considered when evaluating the credibility of the claimant's testimony as to the severity of an impairment).

Ms. Barker also points to the simple fact that she said she could not, despite her most valiant efforts, maintain her business starting in late 2002. This, Ms. Barker says, is strong evidence of the exact effect of her impairment as applied to her ability to work. Because she could not remain gainfully employed in her own business, she says, the

14

inquiry need go no further.  This reasoning, however, only bears on the question whether Ms. Barker could perform her past relevant work *as she had performed it*.  Ms. Barker's inability to maintain her own business as of March 2003 is less pertinent as to the dispositive question in this case — whether Ms. Barker could perform her past relevant work *as it is generally performed in the national economy*.  For this reason, the ALJ's limited reliance on Ms. Barker's claims about her inability to work was justifiable.

Furthermore, the ALJ did not disregard Ms. Barker's testimony categorically.  Tr. at 306 ("I am persuaded by all these statements [by Claimant and other individuals] . . . that the claimant did have some manual dexterity limitations . . . prior to March 31, 2003. . . . Unfortunately, while these statements show that [Ms. Barker] was having problems with her manual dexterity . . . before March 2003, they do not provide specific information about the extent of her physical limitations.").  Thus, the ALJ properly decided not to allow the extent of coordination limitations described in Ms. Barker's statements to outweigh the medical evidence regarding the severity of coordination problems.  *See Blea v. Barnhart*, 466 F.3d 903, 904 (10th Cir. 2006) (stating that a claimant's testimony as to the extent of an impairment may only be credited to the extent it is not inconsistent with the medical evidence of record).

### 3.  Third-Party Witnesses

Ms. Barker claims that the ALJ should have given greater weight and consideration to the testimony of third-party lay witnesses who periodically observed Ms. Barker's deteriorating condition.  Ms. Barker seeks to show through these lay witness

statements, as with her own testimony, that the severity of her manual dexterity limitations was not accurately reflected in the RFC. But, as with Ms. Barker's own testimony, the ALJ reasonably evaluated the credibility of these statements and concluded that they did not outweigh the medical record evidence.

Ms. Barker asserts that these witnesses' statements make "clear" that she had lost the ability to paint at a level required by her job as early as 2001. Aplt. Br. at 31. While this assertion may well be true, Ms. Barker has made no showing that diminished painting ability impacted her ability to work as an art director as the job is performed in the national economy.

Ms. Barker also argues that the statements show that she "could no longer manipulate objects, type, use a mouse, or perform even more mundane manual tasks" by the end of 2002. Aplt. Br. at 31. This contention overstates the implications of the lay witness statements, particularly in light of the limited credibility reasonably attributed to them by the ALJ. As the ALJ articulated, "while [the lay witness] statements show that [Ms. Barker] was having problems with her manual dexterity or strength before March 2003, they do not provide specific information about the extent of her physical limitations." Tr. at 306. In other words, the statements did not address the specific functional limitations as to Ms. Barker's ability to type or use a mouse. To be sure, in the absence of *any* medical evidence, such limitations might reasonably be inferred from the statements. But here there is medical evidence that must be considered; Ms. Barker's asserted inference would run counter to the June 2004 and earlier assessments, where

16

mild or no manual dexterity problems were observed. Thus, the ALJ's unwillingness to infer more severe dexterity and coordination problems in light of the lay witness statements was justified by substantial evidence.

*4. RFC Determination*

Ms. Barker alleges that the evidentiary record belies the ALJ's conclusion as to her residual functional capacity. Specifically, Ms. Barker suggests that the RFC should have included a finding that Ms. Barker "was not able to use her right hand to paint, draw, type[,] and perform other manual functions as of March . . . 2003." Aplt. Br. at 17. The ALJ disagreed, refusing to accept Ms. Barker's argument that she was not capable of "any rapid, repetitive work." Tr. at 311.

We agree with Ms. Barker that her proposed finding might well have been a supportable one. However, we are tasked only with reviewing the substantiality of the evidence that supports the ALJ's findings, rather than determining the adequacy of other possible findings. For the foregoing reasons, we agree with the district court that the ALJ's RFC determination was supported by substantial evidence.

**C. Application of the RFC to Step Four of the Disability Determination**

All this analysis about whether the ALJ arrived at a suitable conclusion as to Ms. Barker's RFC only takes us so far. Having concluded that the RFC determination was proper, we are still left to ask whether that RFC allowed Ms. Barker to perform her "past

17

relevant work."[9]  "Past relevant work is work that [the claimant] ha[s] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it."  20 CFR § 404.1560(b)(1).

The Commissioner concedes that Ms. Barker's RFC would *not* have allowed her to perform her past relevant work *as she had performed it*.  This is of no importance, the Commissioner tells us, because Ms. Barker could perform her past relevant work *as it was performed in the national economy*.  The only textual support we find in the regulations for the Commissioner's assertion appears in 20 CFR § 404.1560(b)(2), which describes how the claimant's vocational background is considered at step four.  "A vocational expert or specialist may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy."  20 CFR § 404.1560(b)(2).  But this regulation only tells us that it is permissible for a vocational expert to opine on how certain work is performed in the national economy.

---

[9] The Social Security regulations, in 20 CFR § 404.1520(f)), provide as follows:

"Your impairment(s) must prevent you from doing your past relevant work. If we cannot make a determination or decision at the first three steps of the sequential evaluation process, we will compare our residual functional capacity assessment, which we made under paragraph (e) of this section, with the physical and mental demands of your past relevant work. (See § 404.1560(b).) If you can still do this kind of work, we will find that you are not disabled."

18

The Commissioner offered clarification in Social Security Ruling 82-61. There, the following policy statement was laid out:

> Under sections 404.1520(e) and 416.920(e) of the regulations, a claimant will be found to be 'not disabled' when it is determined that he or she retains the RFC to perform:
>
> 1. The actual functional demands and job duties of a particular past relevant job; *or*
>
> 2. The functional demands and job duties of the occupation as generally required by employers throughout the national economy.

SSR 82-61, 1982 WL 31387, at *2.

If SSR 82-61's plain terms represent the law, then there is no dispute that the ALJ was correct to base his conclusion on Ms. Barker's ability to perform her past relevant work as it is performed in the national economy. But we must remember, of course, that "social security rulings do not carry the force and effect of law." *Andrade v. Secretary of Health & Human Services*, 985 F.2d 1045, 1051 (10th Cir. 1993). We defer to such rulings, however, unless they are "plainly erroneous or inconsistent with the Social Security Act." *Id.* (quotations and brackets omitted); *cf. Auer v. Robbins*, 519 U.S. 452, 461 (deferring to an agency's interpretation of its own regulations unless the interpretation is "plainly erroneous or inconsistent with the regulation") (internal quotations omitted). And as to the specific interpretation at issue here, we have previously considered and upheld the validity of SSR 82-61, concluding that a claimant "bears the burden of proving his inability to return to his particular former job *and* to his former occupation as that occupation is generally performed throughout the national

19

economy." *Andrade*, 985 F.2d at 1051 (emphasis added).[10]

In Ms. Barker's case, the ALJ found that, "[i]n comparing the claimant's residual functional capacity with the physical and mental demands of this [past relevant] work, . . . the claimant is able to perform [her past relevant work as an art director] as generally performed." Tr. at 310. The ALJ based this conclusion on a vocational expert's response to a hypothetical question involving an individual with an RFC matching Ms. Barker's. *Id.* Ms. Barker has not challenged the vocational expert's qualifications, nor does she assert that the ALJ improperly interpreted the expert's testimony on this point. Thus, we find no legal error in the ALJ's decision, which rested on the premise that Ms. Barker could perform her past relevant work as it is performed in the national economy.

\* \* \*

The ALJ's determination of Ms. Barker's RFC was supported by substantial evidence in the record. The available objective medical records, scant though they were, afforded a reasonable basis for the ALJ's conclusion that Ms. Barker's manual dexterity limitations were no more than "mild" as of March 2003, limiting her to sedentary work and preventing her from performing rapid repetitive movements for more than one-half the workday at that time. The ALJ applied proper legal standards and adequately explained the basis of credibility determinations in considering Ms. Barker's own

---

[10] On appeal, Ms. Barker has not articulated a challenge to the Commissioner's interpretation of the Act and accompanying regulations as exposited in SSR 82-61. Therefore, we do not consider whether SSR 82-61 might be an invalid interpretation that is not owed deference.

20

testimony as well as observations by third-party lay witnesses.  The ALJ also reasonably evaluated and incorporated the testimonial evidence, to the extent it was deemed credible, to the medical evidence in the record.  Finally, the ALJ properly based his finding that Ms. Barker was not disabled on her ability to perform past relevant work as it is performed in the national economy.   Thus, we **AFFIRM** the Commissioner's decision denying Ms. Barker's claim for disability insurance benefits.  Ms. Barker's motion for leave to proceed *in forma pauperis* is **GRANTED**.

ENTERED FOR THE COURT


William J. Holloway, Jr.
Circuit Judge

21